O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL JESSE ORTIZ,<br><br>        Defendant. | Case No. 8:23-cr-00053-JWH-1<br><br>**ORDER REGARDING DEFENDANT'S MOTIONS:**<br>**(1) TO EXCLUDE EVIDENCE UNDER THE FOURTH AMENDMENT [ECF No. 19];**<br>**(2) TO SUPPRESS DIGITAL EVIDENCE [ECF No. 22];**<br>**(3) TO EXCLUDE EVIDENCE UNDER THE FIFTH AMENDMENT [ECF No. 23]; AND**<br>**(4) TO DISMISS CASE UNDER THE SIXTH AMENDMENT [ECF No. 25]** |

# I.  SUMMARY OF DECISION

Before the Court are four motions filed by Defendant Michael Jesse Ortiz. Specifically, Ortiz seeks the following relief:

- the exclusion of evidence under the Fourth Amendment;[1]
- the suppression of evidence derived from the search of digital devices;[2]
- the exclusion of evidence under the Fifth Amendment;[3] and
- the dismissal of the case under the Sixth Amendment.[4]

The Government opposed all four motions,[5] and Ortiz replied with respect to his Fourth Amendment and Cellphone Suppression Motions.[6]  The Court conducted an evidentiary hearing on the motions in December 2023.[7]  The Court then ordered supplemental briefing,[8] which the parties provided.[9]

After considering the evidence adduced at the hearing, the argument of counsel, and the documents of record in this case, the Court **GRANTS** Ortiz's Fourth Amendment Motion, Cellphone Suppression Motion, and Fifth Amendment Motion, and it **DENIES** his Sixth Amendment Motion.

---

[1]      Def.'s Mot. to Exclude Evidence for Fourth Amendment Violations (the "Fourth Amendment Motion") [ECF No. 19].

[2]      Def.'s Mot. to Suppress Evidence Derived from the Illegal Search of Digital Devices (the "Cellphone Suppression Motion") [ECF No. 22].

[3]      Def.'s Mot. to Exclude Evidence for Fifth Amendment Violations (the "Fifth Amendment Motion") [ECF No. 23].

[4]      Def.'s Mot. to Dismiss Case for Sixth Amendment Violation (the "Sixth Amendment Motion") [ECF No. 25].

[5]      Opp'n to the Fourth Amendment Motion (the "Fourth Amendment Opposition") [ECF No. 27]; Opp'n to the Cellphone Suppression Motion (the "Cellphone Suppression Opposition") [ECF No. 28]; Opp'n to the Fifth Amendment Motion (the "Fifth Amendment Opposition") [ECF No. 29]; Opp'n to the Sixth Amendment Motion (the "Sixth Amendment Opposition") [ECF No. 30].

[6]      Reply in Supp. of the Fourth Amendment Motion (the "Fourth Amendment Reply") [ECF No. 38]; Reply in Supp. of the Cellphone Suppression Motion (the "Cellphone Suppression Reply") [ECF No. 37].

[7]      Evidentiary Hearing Re Def.'s Mots. (the "Motion Hearing") [ECF No. 50].

[8]      *Id.*

[9]      Suppl. to the Fourth Amendment Motion ("Ortiz's Supplemental Briefing") [ECF No. 52]; Suppl. to the Fourth Amendment Opposition (the "Government's Supplemental Briefing") [ECF No. 53].

## II.  BACKGROUND

### A.    Traffic Stop, Arrest, *Miranda* Recitation, and Search

On December 26, 2019, Anaheim Police Officers Ryan Wardle and Cory Reinmiller were patrolling in the area around Beach Boulevard and Ball Road in Anaheim, California.[10]  That neighborhood is a "high-crime area."[11]  Around 12:00 noon, the Officers saw a white Toyota Corolla turn into a Chevron gas station;[12] the Officers subsequently told Ortiz that they "thought [the occupants] saw [the Officers] and were turning around to take off."[13]  The Officers ran a database search of the Toyota's license plate and discovered that its registration had expired.[14]

The Officers, in their police cruiser, followed the Toyota to a gas pump at the Chevron station and parked diagonally behind the car.[15]  By the time that the Officers exited their cruiser, Ortiz—the passenger—was walking toward the gas station's convenience store with his cellphone in his hand.[16]  Ortiz's girlfriend at the time, Jesenia

---

[10]     *See* Fourth Amendment Motion, Ex. B (the "Reinmiller Bodycam Footage") [ECF No. 21] 3:56-4:18; Fourth Amendment Motion, Am. Ex. E (the "Reinmiller Bodycam Transcript") [ECF No. 26-2] 6; Fourth Amendment Opposition 2:12-17.

[11]     Decl. of Cory Reinmiller (the "Reinmiller Declaration") [ECF No. 31] ¶ 4; Corrected Decl. of Ryan Wardle (the "Wardle Declaration") [ECF No. 35] ¶ 4.  The Court has "discretion to take judicial notice under Rule 201 [of the Federal Rules of Evidence] of the existence and content of published articles."  *United States v. W.R. Grace*, 504 F.3d 745, 766 (9th Cir. 2007).  The Court exercises that discretion to note the existence of the City of Anaheim's "Rebuild Beach Boulevard" initiative, aimed at addressing "the problems of Beach—human sex trafficking, drugs, blighted motels that no longer serve travelers and more."  City of Anaheim, *Rebuild Beach*, https://anaheim.net/6064/Rebuild-Beach-Boulevard.  The initiative includes "upgraded streetlights" along Beach and Ball "as part of [the City's] larger efforts to address public safety and redevelopment."  *Id.*  The exhibits that Ortiz and the Government produced in the hearing support the Court's finding:  taken together, Ortiz's Exhibit 2, a table of "Beach Blvd Crime Statistics by Years," and the Government's Exhibit 3, a "Heat Map" of crime in Anaheim, show that the intersection of Beach and Ball appears to have been the epicenter of Anaheim's highest crime area for the last three years.  *See* Hr'g Ex. 2 [ECF No. 55]; Hr'g Ex. 3 [ECF No. 54].

[12]     Fourth Amendment Opposition 2:12-22.

[13]     Reinmiller Bodycam Footage 4:04-4:18.

[14]     Fourth Amendment Opposition 2:22-23; *see also* Fourth Amendment Motion, Ex. A (the "Wardle Bodycam Footage") [ECF No. 21]) 0:20; Fourth Amendment Motion, Am. Ex. D (the "Wardle Bodycam Transcript") [ECF No. 26-1] 1.

[15]     Reinmiller Bodycam Footage 0:00-0:25; *see also* Fourth Amendment Opposition 2:23-25.

[16]     Reinmiller Bodycam Footage 0:00-0:25; *see also* Fourth Amendment Opposition 2:23-25.

Lopez—the driver—exited the Toyota seconds later.[17]  Ortiz walked directly in front of the police cruiser as the Officers exited the vehicle,[18] and Officer Wardle spoke to Ortiz.[19] In response, Ortiz turned 90 degrees to his right, then walked two to three steps to approach Officer Wardle.[20]  Ortiz was wearing a somewhat baggy gray t-shirt, and his forearm tattoos—including a large tattoo associated with the Mexican Mafia[21]—were readily visible from Officer Wardle's perspective.[22]  Officer Wardle stated that, upon first encountering Ortiz, he noticed Ortiz's tattoo and, based upon his experience in law enforcement, recognized it as gang-related.[23]

Officer Wardle then gestured toward the police cruiser, indicating that he wished to conduct a patdown search of Ortiz, and Ortiz complied.[24]  Officer Wardle grasped Ortiz's arm to guide Ortiz toward the hood of the cruiser; placed his hands on Ortiz's back; then gripped Ortiz's hands behind Ortiz's back.[25]  Officer Wardle stated to Ortiz, "the registration expired on your car," and he asked if Ortiz had "any weapons on

---

[17]     Reinmiller Bodycam Footage 0:25-0:45; *see also* Fourth Amendment Motion 8:4-5; Fourth Amendment Opposition 2:27-3:2.

[18]     Reinmiller Bodycam Footage 0:25-0:30.

[19]     The record does not convey what Officer Wardle said to Ortiz to cause him to stop; Officer Wardle's bodycam footage does not contain audio for the first 20 seconds, and the parties did not discuss Officer Wardle's specific statements in their respective briefs.  During the hearing, Ortiz's counsel argued that Officer Wardle's first recorded words (stating that the Toyota's registration was expired and asking if Ortiz possessed any weapons) *are* the very first words that he said to Ortiz.  *See* Rep.'s Tr. of Proceedings (the "Hearing Transcript") 89:23-90:12.  Based upon its review of the bodycam footage, the Court finds to the contrary.  It appears that Officer Wardle had already addressed Ortiz, and Ortiz had already turned to face Officer Wardle in response, by the time that the audio begins and Officer Wardle's first recorded words are heard.  Wardle Bodycam Footage 0:00-0:20.  Those words are therefore likely ***not*** the first words that Officer Wardle spoke to Ortiz.

[20]     Reinmiller Bodycam Footage 0:25-0:32; Wardle Bodycam Footage 0:00-0:02; *see also* Fourth Amendment Motion 8:5-7 (characterizing the encounter as Officer Wardle "walk[ing] up and stand[ing] between Mr. Ortiz and his destination"); Fourth Amendment Opposition 3:3-7 (characterizing the encounter as the Officers "stop[ing] the driver and the passenger . . . as they made their way from the Toyota to the gas station convenience store").

[21]     The Court takes judicial notice, within its discretion (*see supra* n.11), that a tattoo of two bars with three dots—like the one on Ortiz's left forearm—may be an identifier of the wearer's membership in the Mexican Mafia.  *See* National Gang Center Newsletter, Summer 2016, https://www.nationalgangcenter.gov/Content/Newsletters/NGC-Newsletter-2016-Summer.pdf, 2 & 4.

[22]     Wardle Bodycam Footage 0:00-0:05.

[23]     Wardle Declaration 2:15-24.

[24]     Wardle Bodycam Footage 0:05-0:23.

[25]     *Id.*

[him]."[26]  Officer Wardle conducted a patdown search of Ortiz, focusing on Ortiz's waistband and pants pockets.[27]  During the patdown, Officer Wardle asked Ortiz if he had identification, and Ortiz responded, "in my wallet right there."[28]  Officer Wardle sought clarification that Ortiz meant that Ortiz's ID was in his wallet in his pocket—"You have ID right here?"—and Ortiz confirmed.[29]  Officer Wardle then led Ortiz, with Ortiz's hands still secured behind his back, to the curb next to the convenience store.[30]  Officer Wardle instructed Ortiz to sit down with his ankles crossed and to hand over his ID from his wallet.[31]  Ortiz complied.[32]  Officer Wardle reviewed the ID and read Ortiz's name aloud, and Ortiz confirmed his identity.[33]  Ortiz then volunteered that he purchased the Toyota, which prompted Officer Wardle to ask, "This your car?"[34]  Ortiz replied that it belonged to Lopez.[35]  Officer Wardle spoke into his radio, then moved to his cruiser, where he ran a warrant check on Ortiz's ID.[36]

While Officer Wardle was in the cruiser, Officer Reinmiller, who had accompanied Lopez to the curb, asked Lopez and Ortiz about the expired registration, and all three made small talk—Ortiz asked if the Officers were "just patrolling the neighborhood"; Officer Reinmiller asked if Lopez and Ortiz were "from around here"; and Lopez asked Officer Reinmiller, "How was your Christmas?"[37]  When Officer Wardle returned, he advised Officer Reinmiller that there was an outstanding warrant for Ortiz's arrest.[38]  At that point, Officer Reinmiller went to "check their car" to see if there was "anything inside,"[39] while Officer Wardle made more small talk with Ortiz and Lopez.[40]  Officer

---

[26]     *Id.*; *see also* Fourth Amendment Motion 8:7-11; Fourth Amendment Opposition 3:22-23.

[27]     Wardle Bodycam Footage 0:23-0:49.

[28]     *Id.* at 0:39-0:45.

[29]     *Id.* at 0:45-0:49.

[30]     *Id.* at 0:49-1:05.

[31]     *Id.*

[32]     *Id.*

[33]     *Id.* at 1:05-1:19.

[34]     *Id.* at 1:19-1:30.

[35]     *Id.* at 1:30-1:31.

[36]     *Id.* at 1:31-6:55.

[37]     *Id.* at 2:20-7:30.

[38]     *Id.* at 7:30-7:54.

[39]     *Id.* at 7:54-8:17.

[40]     Wardle Bodycam Footage 7:25-7:45.

Reinmiller peered in the passenger side window of the Toyota, leaving the door closed,[41] and saw in plain view "about 20 bag[gies]"[42] containing "a crystalline substance that appeared to be methamphetamine."[43]  Officer Reinmiller then turned around and asked Ortiz and Lopez, "Hey.  What's all that on the floorboard, dude?"[44]  Ortiz answered, "I use methamphetamine."[45]  Officer Reinmiller responded by beginning to place Ortiz in handcuffs.[46]  Officer Wardle took over the task of cuffing Ortiz,[47] and Officer Reinmiller, meanwhile, cuffed Lopez.[48]

While Officer Wardle was cuffing Ortiz, he informed Ortiz that Ortiz had a "warrant anyway [*sic*]," and the two discussed the outstanding warrant.[49]  After Officer Reinmiller cuffed Lopez, he asked Ortiz, "Why you got all that dope, dude?  What's up?"  Ortiz responded that that was how he purchased it.[50]  Then Officer Wardle asked Ortiz, "Besides the meth, is there anything else illegal in the car?"[51]  Ortiz responded "No," and Lopez added "There shouldn't be."[52]  Ortiz offered that he works at a Soup Plantation restaurant and "get[s] high" and "purchase[s] methamphetamine."[53]  At that point, Officer Wardle interrupted Ortiz to read him his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), stating, "All right well since you're under arrest for that warrant, let me read you this first because you're over here talking."[54]

Officer Wardle read Ortiz his *Miranda* rights slowly and clearly, one-by-one, and obtained verbal acknowledgement from Ortiz after he recited each right, and again in culmination.[55]  After Ortiz acknowledged his *Miranda* rights, the Officers proceeded to question Ortiz and Lopez about the drugs in the car—specifically about the large quantity

---

[41]     Reinmiller Bodycam Footage 8:12-8:17.

[42]     *See id.* at 8:30.

[43]     Reinmiller Declaration 2:20-23.

[44]     Reinmiller Bodycam Footage 8:12-8:28.

[45]     *Id.* at 8:28.

[46]     Wardle Bodycam Footage 8:01-8:05.

[47]     *Id.*

[48]     *Id.*

[49]     *Id.* at 8:15-8:29.

[50]     Reinmiller Bodycam Footage 9:43-9:59.

[51]     Wardle Bodycam Footage at 9:40-9:49.

[52]     *Id.*

[53]     *Id.* at 9:49-9:59.

[54]     *Id.* at 9:59-10:03.

[55]     *Id.* at 10:08-10:24.

of methamphetamine that Officer Reinmiller had observed through the window.[56]  The Officers also searched the car and seized Ortiz's cellphone.[57]

## B.    Intervening State Court Cases

### 1.    Case #20NF0610

Ortiz was arrested on separate felony allegations in February 2020[58]—two months after the incident at issue in this case.  The State filed associated charges against Ortiz a few days later, and Ortiz was remanded into Sheriff's custody.[59]  Ortiz posted bond in the State Court case in May 2020, and he appeared in State Court twice in June 2020 and once in August 2020.[60]  The State Court ordered bail exonerated in January 2021.[61]

### 2.    Case #21NF0077

Ortiz was arrested in Santa Ana and held in custody on different charges in January 2021.[62]  He was arraigned in that matter four days later[63]—the same day that his bail was exonerated in the other State Court case.  Ortiz remained in custody, in association with the second set of State Court charges, until April 24, 2023—the day that he was arrested in connection with the instant case.[64]

## C.    July 2020 Warrant and Data Extraction

The Anaheim Police applied for a warrant to search Ortiz's cellphone, which Magistrate Judge John D. Early granted on July 21, 2020.[65]  The warrant instructed the Government to seize the cellphone within 14 days[66] and to conduct a search within

---

[56]    *Id.* starting at 10:24.

[57]    *Id.*

[58]    Sixth Amendment Motion, Ex. B at USAO_000269.

[59]    *Id.*

[60]    *Id.* at USAO_000274-77.

[61]    *Id.* at USAO_000281.

[62]    *Id.* at USAO_000318

[63]    *Id.*

[64]    *See* Sixth Amendment Motion 2:17-18; Sixth Amendment Opposition 1:24-26.

[65]    Cellphone Suppression Motion, Ex. A (the "July 2020 Warrant") USAO000379.

[66]    *See id.*; *see also id.* at USAO000380 (indicating that "execution" of the warrant entails "seizure" of the item, requiring inventory).

120 days (*i.e.*, by November 18, 2020).[67]  The application for that warrant was supported by a sworn affidavit of Task Force Officer Rudy Valdez, an Anaheim Police Detective working with the FBI on Ortiz's case.[68]  The probable cause for the warrant was based upon (1) the facts of the events of December 26, 2019; (2) Officer Valdez's credentials and experience investigating similar cases; (3) Ortiz's criminal history; and (4) a drug test identifying the substance found in the Toyota as methamphetamine.[69]

The warrant listed the "items to be seized" as digital evidence of distribution and conspiracy to distribute controlled substances, as well as any device containing such evidence.[70]  The warrant also detailed a "search procedure for digital devices," which noted that "if the search determines that [the cellphone] does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time."[71]

Between August 8 and 25, 2020, the Government, through its forensic examiner, extracted data from Ortiz's cellphone.[72]  The Government claims that Officer Valdez "did not understand that he was also required to filter out the data within the scope of the warrant,"[73] so the Government applied for an additional warrant to permit the review of the extracted data.[74]

## D.    May 2023 Warrant

On May 2, 2023, the Government applied for a second warrant to search Ortiz's cellphone data.[75]  Magistrate Judge Karen E. Scott granted the application the same day and issued a new warrant that was substantially similar to the original July 2020 Warrant in its description of the "items to be seized" and the "search procedure."[76]  The Government then reviewed the data that had been extracted from Ortiz's cellphone

---

[67]    *See id.* at USAO000385 ("The search team shall complete the search of the [cellphone] as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.").

[68]    *Id.* at USAO000389-90.

[69]    *Id.* at USAO000392-97.

[70]    *See id.* at USAO000382-84.

[71]    *Id.* at USAO000385-88.

[72]    *See* Cellphone Suppression Motion, Ex. B (the "Extraction Report") USAO000483.

[73]    Cellphone Suppression Opposition 5:1-5.

[74]    *Id.* at 5:7-18.

[75]    *See* Cellphone Suppression Motion, Ex. C (the "May 2023 Warrant").

[76]    *Id.*

pursuant to the July 2020 Warrant and identified what the Government characterizes as "[s]ignificant evidence of [Ortiz's] drug trafficking activity," including incriminating text messages and photographs.[77]

## E.    Indictment and Subsequent History of This Case

On July 21, 2020, the Government filed its Complaint against Ortiz in this case and requested to detain him.[78]  Ortiz was arrested on April 24, 2023, and he made his initial appearance in this Court the following day.[79]  Ortiz was indicted in this case on May 3, 2023, and he was arraigned 12 days later.[80]  Trial was originally set for June 26, 2023.[81]  The parties twice stipulated to continue the trial date—first to October 2, 2023,[82] then to January 29, 2024.[83]

## F.    Instant Motions and Upcoming Deadlines

In July 2023, the parties stipulated to, and the Court approved, a briefing schedule for the instant Motions.[84]  Pursuant to that schedule, Ortiz filed the four Motions in September 2023; the Government filed its Oppositions in October 2023; and Ortiz replied in November 2023.[85]  The hearing on these Motions was originally set for December 1, 2023, but the parties stipulated to continue the hearing to December 20, 2023.[86]

---

[77]    Cellphone Suppression Opposition 5:25-6:4.

[78]    Compl. [ECF No. 1].

[79]    Minutes of Initial Appearance on Local Complaint [ECF No. 5].

[80]    Indictment [ECF No. 10]; Minutes of Post-indictment Arraignment (the "Arraignment") [ECF No. 12].

[81]    Arraignment.

[82]    First Stipulation to Continue Trial [ECF No. 13]; Order Continuing Trial Date [ECF No. 14].

[83]    Second Stipulation to Continue Trial [ECF No. 15]; Order Continuing Trial Date [ECF No. 16].

[84]    Stipulation for Order Regarding Briefing Schedule for Mots. to Suppress [ECF No. 17]; Order Granting Briefing Schedule for Mots. to Suppress [ECF No. 18].

[85]    *See id.*

[86]    Stipulation to Continue Mot. Hr'g [ECF No. 41]; Order Continuing Mot. Hr'g [ECF No. 42].

The Court conducted an evidentiary hearing on that date[87] and directed the parties to file supplemental briefs.[88]  Thereafter the parties stipulated again to continue the trial date—to March 25, 2024.[89]

## III.  LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution protects against "unreasonable searches and seizures."  U.S. Const. amend. IV.  It also requires that warrants must be based upon probable cause, "supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  *Id.*

The Fifth Amendment protects against compelled self-incrimination.  *See* U.S. Const. amend. V.  Arresting officers can avoid inadvertently infringing an accused person's Fifth Amendment rights by "adequately and effectively appris[ing him] of his rights" through *Miranda* warnings.  *See Miranda*, 384 U.S. at 467.

The Sixth Amendment protects an accused person's "right to a speedy and public trial."  U.S. Const. amend. VI.

## IV.  ANALYSIS

### A.    Alleged Fourth Amendment Violations

In his Fourth Amendment Motion, Ortiz alleges that (1) the Officers unlawfully searched, seized, and arrested him;[90] (2) the Officers unlawfully prolonged his detention;[91] and (3) therefore, all evidence—including Ortiz's statements to the Officers, the evidence from the car, and the evidence discovered on Ortiz's cellphone—should be suppressed as "fruit of the poisonous tree."[92]  Specifically, Ortiz argues that the Officers did not have the necessary "reasonable suspicion" to support the stop-and-frisk—*i.e.*, a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1 (1968)—that the Officers conducted on the hood of the cruiser, but, even if they did, that suspicion dissipated when the Officers found no

---

[87]     Motion Hearing.

[88]     *See* Ortiz's Supplemental Briefing; Government's Supplemental Briefing.

[89]     Third Stipulation to Continue Trial Date [ECF No. 48]; Order Continuing Trial Date [ECF No. 51].

[90]     Fourth Amendment Motion 9:2-15:24.

[91]     *Id.* at 16:1-20:27.

[92]     *Id.* at 21:1-24:12.

weapons or contraband on Ortiz.[93]  Ortiz contends that the Officers' conduct in continuing to hold him on the curb violated his Fourth Amendment rights and, therefore, the evidence that emerged during that encounter may not be used against him.[94]

### 1.    The Initial Stop of Ortiz Was a Traffic Stop Supported by Reasonable Suspicion

Both parties acknowledge that the Officers' initial stop of Ortiz was nonconsensual, such that it needed to have been supported by reasonable suspicion.  *Cf. United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994) (acknowledging that "police interrogation of automobile occupants typically involves a greater degree of intrusiveness than questioning of pedestrians and thus more readily impinges on the Fourth Amendment," but determining that the detention of the defendant did not rise to the level of an investigatory stop because the agent did not act forcefully or aggressively toward the defendant).  Accordingly, the first issue that the Court must address is which line of Fourth Amendment jurisprudence applies to the investigatory stop:  was it a "traffic stop" (as Ortiz contends[95]) or a "*Terry*" stop" (as the Government argues[96])?  The Court concludes that the Government is correct.

The facts that the Toyota had already parked and that Ortiz was in the process of walking away from it are not relevant to this analysis.  A ***legally*** parked car generally indicates that the stop, and the associated questioning, of its occupants does not qualify as a "traffic stop."  *See United States v. Summers*, 268 F.3d 683, 687 (9th Cir. 2001) ("[T]he interaction did not implicate the Fourth Amendment in the same manner as do traffic stops, because the car was parked.").  But the Toyota was not ***legally*** parked; its registration had expired.[97]  That fact alone provided sufficient reasonable suspicion for the Officers to detain the car and its occupants.  *See, e.g.*, *Brendlin v. California*, 551 U.S. 249, 253 n.2 (2007); *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) ("A traffic violation alone is sufficient to establish reasonable suspicion.").

When the police have reasonable suspicion "to direct the vehicle to pull over with the usual array of sirens and flashing lights"—which the Officers could have done here— that reasonable suspicion applies with equal force to allow the police to detain the car and its occupants when the car is already parked.  *See, e.g.*, *United States v. Willis*, 431 F.3d 709 (9th Cir. 2005) (concluding that police officers had reasonable suspicion to conduct a

---

[93]     *See generally id.*

[94]     *See generally id.*

[95]     Fourth Amendment Motion 13:15-22 & 16:3-11.

[96]     Fourth Amendment Opposition 7:1-28.

[97]     *Id.* at 2:22-23.  Ortiz does not assert that the registration was not expired.

traffic stop when they witnessed a car make an illegal U-turn and followed the car to see if it made any additional traffic violations; ran the license plate and found that the car was reported as stolen; then stopped the occupant after he had already emerged from the parked car); *Choudhry*, 461 F.3d at 1098-1104 (holding that reasonable suspicion of a parking violation was sufficient to support an investigatory traffic stop where the police saw an illegally parked car and a "flurry" of movement when they shined their lights). Indeed, even if the Toyota had not already parked and Ortiz had not already emerged, the Officers would still have been within their rights to order Ortiz out of the car, to handcuff him, and to move him—assuming that they had the necessary additional reasonable suspicion to do so. *See Rohde v. City of Roseburg*, 137 F.3d 1142, 1144 (9th Cir. 1998) ("[A]n officer may always order the driver and passenger out of a vehicle during a traffic stop . . . and may even handcuff and move both if [the officer] reasonably fears for his safety.").

### 2. Officer Wardle Had Reasonable Suspicion to Support a Patdown of Ortiz

"To justify a patdown of the driver or a passenger during a traffic stop, . . . just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (emphasis in original). This is a "totality of the circumstances" inquiry. *Id.*

As discussed in the facts section, *see supra* Part II.A., the Court accepts—based upon its own review of the bodycam footage and judicially noticeable facts—the Government's assertion that the area where the Officers stopped the Toyota was a high crime area, that Ortiz was wearing somewhat baggy clothing, and that Ortiz's gang tattoo was clearly visible from Officer Wardle's perspective when he emerged from the cruiser to initiate the traffic stop. Officer Wardle stated that, based upon his experience in about 15 years of law enforcement, Ortiz's appearance and location led him to believe that Ortiz may be a gang member involved in trafficking narcotics; that such gang members frequently carry weapons; and that baggy clothing—like what Ortiz was wearing—may conceal such a weapon.[98] In view of those facts, the "totality of the circumstances" here provided Officer Wardle with reasonable suspicion that Ortiz was an active gang member who could be armed and dangerous. *See, e.g.*, *United States v. Navarro*, 756 F. App'x 702, 704-05 (9th Cir. 2018) (concluding that a high-crime area, proximity to suspicious

---

[98]     Wardle Declaration ¶¶ 4-8.

activity, and gang-related appearance provided reasonable suspicion for a patdown search).  That reasonable suspicion justified the patdown that Officer Wardle conducted on Ortiz.

Ortiz's arguments to the contrary are inapt.  Ortiz cites *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979); *Thomas v. Dillard*, 818 F.3d 864, 884 (9th Cir.), *as amended* (May 5, 2016); and *United States v. I.E.V.*, 705 F.3d 430, 435 (9th Cir. 2012), for the proposition that baggy clothing or a suspicion of drug-dealing alone is insufficient to confer reasonable suspicion for a patdown.[99]  None of those cases is analogous.  In *Thomas*, the defendant did not challenge the officer's initial decision to stop and question him briefly, but argued—and the Ninth Circuit agreed—that the officer did not have reasonable suspicion to order the defendant to submit to a frisk in order to investigate a potential battery because the crime of domestic violence "is not . . . likely to involve the use of weapons." *Thomas*, 818 F.3d at 878.  As such, Thomas's proximity to the underlying domestic violence incident, his baggy clothing capable of hiding a weapon, and his general demeanor, taken together, were not sufficient to confer reasonable suspicion that he was armed and dangerous for the purpose of a *Terry* frisk.  In *Ybarra*, the ***only*** justification that the officers gave for the frisk was that the defendant was wearing a "lumber jacket." *Ybarra*, 444 U.S. at 93.  And in *I.E.V.*, likewise, the ***only*** justification was that a drug-sniffing dog alerted the authorities to the possible presence of drugs in the defendant's car.  *See I.E.V.*, 705 F.3d at 435.

Ortiz further cites *Lopez v. City of Glendora*, 811 F. App'x 1016 (9th Cir. 2020), and *United States v. Sigmond-Ballesteros*, 285 F.3d 1117 (9th Cir. 2002), for the proposition that his tattoo was not sufficient to provide Officer Wardle with reasonable suspicion.[100] Those authorities, too, are inapposite.  In *Sigmond-Ballesteros*, the Ninth Circuit overturned the district court's finding of reasonable suspicion to initiate a traffic stop for suspected drug smuggling based upon the time of day, the driver's attempts to obscure his face, his evasive driving, and the car's missing back seat.  *See Sigmond-Ballesteros*, 285 F.3d at 1120-21.  Likewise, in *Lopez*, the court found that a person's race, clothing, and high-crime location alone were insufficient to justify a patdown.  *See Lopez*, 811 F. App'x at 1018.

The common thread among the cases that Ortiz cites is that they depend exclusively, or almost exclusively, on merely one of the factors that influenced Officer Wardle's decision to conduct a patdown on Ortiz in this case.[101]  The facts in the instant

---

[99]     Fourth Amendment Motion 11:22-12:11.

[100]     *Id.* at 12:12-13:2.

[101]     The only case in this section that is not distinguishable on the totality-of-the-circumstances element is *Ybarra*.  But that case is separately distinguishable because there, the

case are more akin to those in *United States v. Navarro*, 756 F. App'x 702 (9th Cir. 2018). There, the Ninth Circuit concluded that the police had reasonable suspicion to conduct a patdown of the defendant where:

> (1) [the defendant] was in a high-crime area . . .; (2) an apparent "hand to hand" drug deal occurred between two males located next to a van, which seemed to be deliberately parked adjacent to [the defendant's] sedan; (3) [the defendant] was standing just outside the sedan's passenger door, slightly behind a group of men . . .[; and] (4) three males in the group—including [the defendant]—were dressed in red attire, which is associated with [a specific] gang.

*Id.* at 704.

Here, Officer Wardle considered an amalgam of factors: Ortiz was stopped in a high-crime area; he had a clearly visible gang tattoo;[102] and he was wearing baggy clothing capable of concealing a weapon. While the Officers in this case did not witness a suspected drug deal in close proximity, Officer Wardle clearly saw Ortiz's gang tattoo—a detail much more specific and less likely to be the result of happenstance than the color of a defendant's clothing (which was accepted in *Navarro*). Taken together, those considerations conferred reasonable suspicion that Ortiz could be armed and dangerous, justifying a patdown for officer safety.

### 3.     The Officers Did Not Have Sufficient *Additional* Reasonable Suspicion to Detain Ortiz While Officer Wardle Ran Ortiz's License

As a preliminary matter, the Officers' delay to run Ortiz and Lopez's licenses was not an arrest, but merely a detention. For the proposition that the post-patdown detention was an arrest, Ortiz cites *Bailey v. United States*, 568 U.S. 186 (2013), in which the defendant was handcuffed.[103] But, as discussed above, *see supra* Part II.A., the Officers did not handcuff Ortiz at the time that Officer Wardle conducted the patdown. Ortiz also cites *United States v. Washington*, 387 F.3d 1060 (9th. Cir. 2004), for the

---

Supreme Court held that domestic violence does not generally confer a reasonable suspicion that the defendant is armed and dangerous—whereas here, Ortiz was suspected of gang-related drug trafficking, which **does** frequently involve weapons. *See* Wardle Declaration ¶ 6.

[102]     A gang tattoo indicates the wearer's affirmative intent to identify with a criminal enterprise—albeit at the time that the wearer obtained the tattoo and not necessarily later. An individual's display of a gang tattoo provides a much more specific and particularized rationale than race, the factor at issue in *Lopez*, and it does not lend itself to unconstitutional profiling, as race does.

[103]     Fourth Amendment Motion 15:9-11.

definition of "seizure."[104]  In that case, the Ninth Circuit noted that "[a] seizure premised on reasonable suspicion, such as a *Terry*-stop, is not *per se* unconstitutional under the Fourth Amendment, so long as it is sufficiently brief and minimally intrusive," but the court concluded that the seizure at issue there had ripened into an arrest when the questioning officers, accompanied by five or six additional armed officers in plain view, continuously pressured the defendant to allow them to enter his hotel room, and the officers ultimately entered without his permission.  *See id.* at 1069-70.  Here, Ortiz simply sat on a curb, without handcuffs, and waited approximately six minutes for Officer Wardle to run his license.  Between accompanying Ortiz to the curb and formally arresting him, Officer Wardle did almost nothing ***except*** run Ortiz and Lopez's licenses in the database and communicate the existence of Ortiz's outstanding warrant to Officer Reinmiller.  The Court finds that that delay was "sufficiently brief and minimally intrusive."  *Id.* at 1069.  Thus, reasonable suspicion—not probable cause—is the standard applicable to Ortiz's post-patdown detention.

In applying the reasonable suspicion standard, however, the Court agrees with Ortiz,[105] and disagrees with the Government, to the extent that Ortiz argues that reasonable suspicion for the traffic stop did not extend to allow the Officers to continue to detain Ortiz while they ran his license.  The rationale behind a traffic stop—"ensuring that vehicles on the road are operated safely and responsibly"—does not justify running the license of a passenger.  *Rodriguez v. United States*, 575 U.S. 348, 349 (2015).  The Government disagrees with that proposition:  Officer Wardle testified in the hearing, and the Government argues in its Supplemental Briefing, that Officer Wardle ran Ortiz's license "to determine who owned the vehicle."[106]  But, as Officer Wardle testified at the hearing,[107] and as Ortiz notes in his Supplemental Briefing, "prior to exiting his vehicle, [Officer Wardle] conducted a DMV search using the Toyota's license plate, which showed the vehicle was unregistered, ***and also would have shown the owner*** . . . ."[108]  Officer Wardle testified that "he 'did not have time' to scroll down and check" the ownership data on the DMV report.[109]  Scrolling through a report that Officer Wardle had

---

[104]    *Id.* at 9:13-21.

[105]    *Cf.* Fourth Amendment Reply 7:9-22.  The Court concludes that Ortiz was validly detained as part of the traffic stop for the length of time it took to run Lopez's license, *see supra* Part IV.A.1., but the additional time that it took Officer Wardle to run ***Ortiz's*** license required additional reasonable suspicion.  *See, e.g.*, *Rodriguez*, 575 U.S. at 355 (holding that an ordinary traffic stop involves review of the driver's license).

[106]    Government's Supplemental Briefing 2:28-3:1.

[107]    Hearing Transcript 43:24-44:10.

[108]    Ortiz's Supplemental Briefing 1:14-16 (emphasis added).

[109]    *Id.* at 1:17;  *see also* Hearing Transcript 43:24-44:10 (Officer Wardle testifying:  "When I initially ran [the license plate], I didn't see who the registered owner was. . . .  The screen has to

already obtained would have taken him a fraction of the time that it took him to run Ortiz's license—and it would not have required any detention of Ortiz.  Thus, the Court concludes that Officer Wardle's act of running Ortiz's license was not within the scope of the mission of the traffic stop, and, therefore, the Officers needed ***additional*** reasonable suspicion to detain Ortiz, beyond the reasonable suspicion that authorized the traffic stop. *See id.*

The Government next argues in a cursory manner that the same circumstances that justified the patdown authorized the Officers to detain Ortiz to run his license as a "'negligibly burdensome [safety] precaution.'"[110]  The Court is not convinced.  As already discussed, *see supra* Part IV.A.2., reasonable suspicion requires particularity.  *See Montero-Camargo*, 208 F.3d at 1129 ("[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion.") (emphasis in original).  The high crime area and Ortiz's baggy clothing and clearly visible gang tattoo provided the Officers with reasonable suspicion that Ortiz might be armed and dangerous such that Officer Wardle was justified in subjecting Ortiz to a patdown to ensure the Officers' safety.  *See Johnson*, 555 U.S. at 327.  But the patdown came up empty—Ortiz did not have a weapon or any contraband on his body.  The Government does not offer any explanation for why the Officers required ***further*** safety assurances nor for how running Ortiz's license might assuage any safety concerns that they still harbored.

The only plausible explanation for Officer Wardle's decision to run Ortiz's license was to check for an outstanding warrant—in other words, Officer Wardle inferred that Ortiz might be involved in some ***non-specific*** criminal activity, and, therefore, he felt justified in conducting a warrants check.[111]  The Court understands and deeply respects that Officer Wardle was doing his job as assigned by his department.  But, in this instance and under these circumstances, running Ortiz's license amounted to an unconstitutional fishing expedition.  Thus, the Officers' continued detention of Ortiz, beyond the patdown, violated Ortiz's Fourth Amendment rights, and the evidence adduced as a result of that unconstitutional detention—including Ortiz's oral statements, the physical evidence found in the car, and the digital evidence pulled from Ortiz's cellphone—are

---

be scrolled all the way to the bottom to see the current registered owner who the liability was released to. . . .  I didn't have time to do that during the stop.").

[110]      *See* Government's Supplemental Briefing 4:1-5 (quoting *Rodriguez*, 575 U.S. at 356).

[111]      *See, e.g.*, Hearing Transcript 15:14-22 (Officer Wardle stating that part of "the reason to conduct a traffic stop" is "to investigate other crimes, . . . [e]ven if they're not related to the traffic stop") & 18:2-19:8 (Officer Wardle stating that "on December 26, 2019, [his] assignment was to patrol for potential criminal conduct"; "my goal throughout the 12-and-a-half hours [of my shift] is to investigate [possible] criminal activity").

inadmissible as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963).

### a.   The Attenuation Doctrine Does Not Cure Ortiz's Unconstitutional Detention

The Government argues that, nonetheless, the evidence should be admitted pursuant to the attenuation doctrine articulated in *Utah v. Strieff*, 579 U.S. 232 (2016).[112] "Under the attenuation doctrine, '[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *United States v. Baker*, 58 F.4th 1109, 1119 (9th Cir. 2023) (quoting *Strieff*, 579 U.S. at 238) (internal quotations omitted). "Courts determining whether attenuation applies consider the three factors set forth in *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)": (1) "the 'temporal proximity' between the conduct and the discovery of the evidence"; (2) "the 'presence of intervening circumstances'"; and (3) "'the purpose and flagrancy of the official misconduct.'" *Baker*, 58 F.4th at 1119-20 (quoting *Brown*, 422 U.S. at 604); *accord Strieff*, 579 U.S. at 239. "The Government bears the burden of demonstrating admissibility." *Baker*, 58 F.4th at 1120.

In *Strieff*, a police officer was conducting intermittent surveillance on a home pursuant to an anonymous report made on the department's tip line of "narcotics activity" therein. *See Strieff*, 579 U.S. at 235. The officer observed visitors who appeared to be entering the house to purchase drugs—one of whom was Strieff. *See id.* After observing Strieff exit the house, the officer detained and questioned him and requested his identification. *See id.* The officer relayed Strieff's information to dispatch, which reported that Strieff had an outstanding arrest warrant. *See id.* The officer arrested Strieff pursuant to that outstanding warrant and conducted a search incident to the arrest that revealed narcotics and drug paraphernalia in his possession. *See id.* at 235-36. Strieff argued, and the prosecution conceded, that the officer lacked reasonable suspicion to detain Strieff, such that his detention was unconstitutional. *See id.* at 236. The issue before the Supreme Court was "whether the discovery of a valid arrest warrant was a sufficient intervening event to break the causal chain between the unlawful stop and the discovery of drug-related evidence on Strieff's person." *Id.* at 239. The Supreme Court applied the *Brown* factors and concluded that it was. *See id.* at 239-42.

---

[112]    Fourth Amendment Opposition 23:5-24:25; Government's Supplemental Briefing 4:6-5:5.

The *Strieff* Court concluded that the first factor favored suppression because the officer discovered the drugs "only minutes after the illegal stop." *Id.* at 239. It reasoned that "the second factor, the presence of intervening circumstances, strongly favor[ed] the State." *Id.* at 240. It relied upon *Segura v. United States*, 468 U.S. 796 (1984) (Burger, C.J.) (plurality opinion),[113] to conclude that "the existence of a valid warrant favors finding that the connection between unlawful [police] conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" *Id.* It applied that principle to the facts of that case, "where the warrant [for Strieff's arrest] was valid, it predated [the officer's] investigation, and it was entirely unconnected with the stop." *Id.* (quoting *Segura*, 468 U.S. at 815). Finally, the *Strieff* Court determined that the third factor regarding the "purpose and flagrancy of the official misconduct" similarly "strongly favor[ed] the State" because the officer's conduct was not purposeful or flagrant, but "was at most negligent"; the Court found that the officer made "two good-faith mistakes," namely (1) failing to observe how long Strieff had been in the house such that he "lacked a sufficient basis to conclude that Strieff was a short-term visitor who may have been consummating a drug transaction"; and (2) failing "simply [to] ask" Strieff to speak with him, rather than demanding that he do so. *Id.* at 241. Because two of the three factors—the second and third factors—favored the Government, the *Strieff* Court held that the attenuation doctrine applied. *See id.* at 242.

Critically, the *Strieff* Court noted:

[T]here is no indication that this unlawful stop was part of any systemic or recurrent police misconduct. To the contrary, all the evidence suggests that the stop was an isolated instance of negligence that occurred in connection with a bona fide investigation of a suspected drug house.... [The officer] sought information from Strieff to find out what was happening inside a house whose occupants were legitimately suspected of dealing drugs. ***This was not a suspicionless fishing expedition* "in the hope that something would turn up."**

*Id.* at 242 (quoting *Taylor v. Alabama*, 457 U.S. 687, 691 (1982)) (emphasis added).

Here, like in *Strieff*, the first factor favors suppression—the mere minutes between the Fourth Amendment violation and the Officers' discovery of the drugs was a negligible delay. *See id.* at 239. And here, like in *Strieff*, the second factor favors the Government:

---

[113]    The *Strieff* Court described *Segura* as a case with "similar facts" in which the "agents had probable cause to believe that the apartment occupants were dealing cocaine[,] . . . sought a warrant[, and i]n the meantime, . . . entered the apartment, arrested an occupant, and discovered evidence of drug activity during a limited search for security reasons." *Strieff*, 579 U.S. at 240 (citing *Segura*, 468 U.S. at 799-801).

the arrest warrant for Ortiz was valid, it predated the Officers' initial license plate search, and it was unconnected with the traffic stop. *See id.* at 240.

Unlike in *Strieff*, however, the third factor favors suppression in this case. Officer Wardle testified that in his duty of patrolling neighborhoods, he uses traffic stops—like the one at issue here—as a "useful investigative tool" to uncover "other possible crimes," "[e]ven if they are not connected to the traffic stop."[114] Officer Wardle acknowledged that, when he conducted the traffic stop involving Ortiz, he intended to "investigate criminal activity," including possible gang or drug activity.[115] Therefore, Officer Wardle's ***objective*** in running the warrants check was to conduct a blind search for unrelated crimes. The Ninth Circuit "ha[s] held that suppression is favored where an officer violates the law 'with the purpose of extracting evidence against the defendant.'" *Baker*, 58 F.4th at 1120 (quoting *United States v. Washington*, 387 F.3d 1060, 1075 (9th Cir. 2004)). This appears to be such a case: Officer Wardle intended to "extract[] evidence against [Ortiz]."[116] *Id.*

The Government also cites *United States v. Stokes*, 2022 WL 486636 (9th Cir. Feb. 17, 2022), *cert. denied*, 143 S. Ct. 257 (2022), for the proposition that the Ninth Circuit rejected similar concerns about officers' improper purpose in the context of a traffic stop.[117] But *Stokes* is distinguishable on two key grounds: (1) the driver in that case admitted that there was marijuana in the vehicle—*i.e.*, the officers were aware of actual illegal activity in the car, they were not blindly searching for it; and (2) in *Stokes*, "nothing in the record" suggested that the traffic stop involved the type of police conduct on which the third factor focuses and about which the *Strieff* Court expressed concern. *See id.* at *2; *see also United States v. Stokes*, 2021 WL 388837 (N.D. Cal. Feb. 4, 2021), *rev'd*, 2022 WL 486636 (9th Cir. Feb. 17, 2022).

In this case, Officer Wardle's testimony clarified that the bulk of his assigned duties on patrol—as dictated by his employer—might be described as comprising an unconstitutional "suspicionless fishing expedition." *Strieff*, 579 U.S. at 242. Indeed, during the hearing, the Government acknowledged the Court's concern about the attenuation doctrine becoming a backdoor for unconstitutional "dragnet" searches, like the ones that Officer Wardle admitted that he conducted as part of his patrol[118]—but the

---

[114]     Hearing Transcript 15:17-22 & 17:12-19:8.

[115]     *Id.* at 18:24-19:8.

[116]     Again, the Court understands that Officer Wardle did not ***personally*** intend to infringe Ortiz's constitutional rights; he was carrying out his job as assigned.

[117]     *See* Government's Supplemental Briefing 4:13-19.

[118]     *See, e.g.*, Hearing Transcript 15:14-22 (Officer Wardle stating that part of "the reason to conduct a traffic stop" is "to investigate other crimes, . . . [e]ven if they're not related to the

Government argued that that concern was not "sufficient" to decline to apply the doctrine when a valid preexisting warrant exists.[119]  In other words, the Government would have the Court completely ignore the third factor in cases in which the second factor favors the Government's position.  But, as this Court understands it, that is not the law—the attenuation doctrine requires this Court to consider all three factors in totality.  *See Baker*, 58 F.4th at 1119-20.  Here, unlike in *Strieff*, two of the three factors—the first and third factors—favor suppression, and the Government has not satisfied its burden to prove otherwise.  *See id.* at 1120.  Thus, the Court concludes that the attenuation doctrine does not apply.

### b.    The Inevitable Discovery Doctrine Likewise Does Not Make the Evidence Admissible

Finally, prompted by the Court's questioning during the hearing,[120] the Government argues that the evidence is separately admissible under the doctrine of inevitable discovery.[121]  The inevitable discovery doctrine "is available when the government demonstrates, by a preponderance of the evidence, that it would inevitably have discovered the incriminating evidence through lawful means."  *United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000).  "The government can meet its burden by demonstrating that, 'by following routine procedures, the police would inevitably have uncovered the evidence.'"  *Id.* at 1107 (quoting *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989)).

Here, the Government asserts that "[c]ommon sense dictates that, at some point during the stop, the officers would have looked in the car" and, therefore, would have discovered the drugs in plain view.[122]  But Officer Reinmiller did not look into the Toyota until approximately eight minutes into the stop—after Officer Wardle ran Ortiz and Lopez's licenses and alerted Officer Reinmiller regarding the existence of Ortiz's outstanding warrant—even though both Officers had ample opportunity to do so during the pendency of the valid traffic stop and patdown.  Officer Reinmiller approached the Toyota during the initial stop, standing within glancing distance while he spoke with Lopez, but he did not look inside the car.[123]  Officer Reinmiller also stood within mere feet

---

traffic stop") & 18:2-19:8 (Officer Wardle stating that "on December 26, 2019, [his] assignment was to patrol for potential criminal conduct"; "my goal throughout the 12-and-a-half hours [of my shift] is to investigate [possible] criminal activity").

119   *Id.* at 88:22-89:11.

120   *See id.* at 84:7-14 & 84:19-85:21.

121   Government's Supplemental Briefing 5:6-21.

122   *Id.* at 5:17-20.

123   Reinmiller Bodycam Footage 0:40-1:20.

of the vehicle while Officer Wardle ran the licenses—but still he did not look inside.[124] And Officer Wardle stood equally close to the Toyota during the initial encounter and while speaking with Ortiz at the curb, then he approached the car on his way to the cruiser to run the licenses—but he did not look inside.[125] Based upon the record before the Court, the Government's assertion of what "[c]ommon sense dictates" does not convince the Court, by a preponderance of the evidence, that the inevitable discovery doctrine is triggered here.

Ortiz's Fourth Amendment Motion is **GRANTED**.

## B.   Considering Ortiz's Related Motions in the Hypothetical—Assuming That Ortiz's Fourth Amendment Motion Was Denied

Because the Court has determined that Ortiz's Fourth Amendment rights were violated by virtue of the license search without reasonable suspicion, all evidence resulting from that search—including Ortiz's statements, the physical evidence found at the scene, and the digital evidence pulled from Ortiz's cellphone—is rendered inadmissible as "fruit of the poisonous tree." *Wong Sun*, 371 U.S. 485-86. Thus, Ortiz's Cellphone Suppression Motion and Fifth Amendment Motions are both **GRANTED** by extension: the Fourth Amendment violation discussed above negated any probable cause to arrest or to search Ortiz or his belongings, such that both warrants at issue in the Cellphone Suppression Motion were invalid and the interrogation was conducted in violation of Ortiz's Fifth Amendment rights.

But, for the purpose of a possible appeal, the Court considers those motions under the alternative premise that the license search *was* valid and Ortiz's Fourth Amendment rights were not violated.

### 1.   Application of the Fourth Amendment to Searches of Ortiz's Digital Devices

Ortiz argues that the July 2020 and May 2023 warrants lacked probable cause and particularity and that the Government delayed its search until May 2023 without a legitimate reason, such that the suppression of the digital evidence is independently appropriate.[126] The Court is not convinced.

---

[124]   *Id.* at 1:20-7:30.

[125]   Wardle Bodycam Footage 0:00-2:00.

[126]   *See generally* Cellphone Suppression Motion.

### a.    The July 2020 Warrant and the May 2023 Warrant Were Valid

"An affidavit in support of a search warrant shows probable cause if, under the totality of the circumstances, it reveals 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Garay*, 938 F.3d 1108, 1113 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 976 (2020) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In an application for a warrant to search the contents of a cellphone for evidence of the possession of contraband, probable cause may be shown via an affidavit testifying to the circumstances of the defendant's arrest and the phone's proximity to the defendant upon arrest, and a recital of "the affiant's training and experience, reflecting that people who possess [the subject contraband] like to take pictures of [it] with their [cellphones], and will also communicate via text regarding criminal activity." *Id.* (internal quotations omitted). Officer Valdez's sworn affidavits in support of each warrant provide exactly those elements.[127] This Court "owe[s] 'great deference' to magistrate judges' probable-cause findings." *Id.* Accordingly, the Court concludes that the warrants were supported by probable cause.[128]

With respect to Ortiz's particularity argument, the Court follows the Ninth Circuit in *Garay*: "Magistrate judges may, as they likely did here, draw their own reasonable inferences about where evidence might be kept based on the nature of the suspected offense and the nature of the evidence sought." *Id.* at 1114. The Magistrate Judge's warrant in *Garay* was nearly identical in its scope to the warrants at issue here.[129] Thus, the warrants were sufficiently particular.

### b.    The Officers Did Not Delay Unreasonably in Conducting the Search

Ortiz argues that the unreasonable delay doctrine applies to the period between the December 2019 seizure of his phone and the issuance of the July 2020 warrant, as well as the even longer period between the seizure of his phone and the issuance of the May 2023 warrant.[130] Ortiz asserts that his Fourth Amendment rights were violated as a result of those delays.[131] The unreasonable delay doctrine provides that "[a]n unreasonable delay between the seizure of a package and obtaining a search warrant may violate [a]

---

[127]    July 2020 Warrant USAO000389-402; May 2023 Warrant USAO000414-21.

[128]    Here, the Court reemphasizes that this statement is ***only true in the hypothetical***, assuming (incorrectly) that Ortiz's Fourth Amendment rights were not violated.

[129]    *Compare* Mot. to Suppress Evidence, Ex. B [ECF No. 23-2] in *United States v. Garay*, Case No. 5:17-mj-00109-DUTY

[130]    Cellphone Suppression Motion 16:1-20:26.

[131]    *Id.*

defendant's Fourth Amendment rights." *United States v. Johnson*, 875 F.3d 1265, 1276 (9th Cir. 2017) (quoting *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015)). Courts, not surprisingly, apply a reasonableness test to determine whether a delay was "unreasonable." *See id.*

The Ninth Circuit defines a "search" of a cellphone—requiring a probable cause warrant under the Fourth Amendment—as "the download of [its] electronic data." *United States v. Salazar*, 598 F. App'x 490, 491 (9th Cir. 2015); *see also United States v. Kopankov*, 2023 WL 3772804, at *3–*4 (N.D. Cal. May 11, 2023) ("The GrayKey extraction was a search and seizure because the government physically invaded Defendant's phone to gain information . . . [and] that physical invasion into Defendant's constitutionally protected device downloaded 'the privacies' of Defendant's life."). In the instant case, the Government "seized" Ortiz's phone in connection with his arrest on December 26, 2019, and it "searched" his phone by extracting the data in August 2020, pursuant to the July 2020 Warrant. Thus, the Court concludes that the unreasonable delay doctrine applies only to the period between the December 2019 seizure and the July 2020 Warrant.

The reasonableness test balances the defendant's privacy interest against the Government's interest in conducting the search. *See Sullivan*, 797 F.3d at 633. A defendant's interest is "significantly diminishe[d]" when he is "incarcerated and cannot make use of [the] seized property." *Id.* (citing *Samson v. California*, 547 U.S. 843, 849–50 (2006)); *see also Segura*, 468 U.S. at 813. Here, Ortiz was incarcerated in connection with State Court Case #20NF0610 between his February 2020 arrest and when he posted bond in May 2020. Thus, the only times that he could have made use of his cellphone, for the purpose of this inquiry, were between December 26, 2019, and February 2020, and again between May 2020 and July 2020—approximately four months total. "Moreover, an individual who . . . 'never sought return of the property' has not made a sufficient showing that the delay was unreasonable." *Sullivan*, 797 F.3d at 633-34 (quoting *United States v. Johns*, 469 U.S. 478, 487 (1985)). Ortiz does not assert that he sought the return of his phone at any point between December 2019 and July 2020.

The Government's interest is strong when it has a "reasonable basis for retaining and searching the [cellphone] based on the likelihood that it contain[s] evidence . . . ." *Id.* at 634. Furthermore, two of the four months during which Ortiz could have used his phone (*i.e.*, May to July 2020) occurred during the initial peak of the COVID epidemic, when nearly every organization in the country was either shuttered or operating at a reduced capacity. The Government possesses a reasonable explanation for its delay during that time.

The balance of the interests here leads the Court to conclude that Ortiz did not suffer from an unreasonable delay with respect to the search of his cellphone.

2. **Alleged Fifth Amendment Violations**

Ortiz next argues that the Government violated his Fifth Amendment rights when he was interrogated without adequate *Miranda* warnings because (1) he was "in custody" as soon as he was initially stopped by Officer Wardle; (2) the Officers interrogated him without administering his *Miranda* rights; and (3) the Officers deliberately circumvented his *Miranda* rights by engaging in a "two-step" interrogation.[132]

First, as discussed above, *see supra* Part IV.A.3., Ortiz was not arrested, for the purpose of the *Miranda* doctrine, until the Officers handcuffed him.[133]  And the second issue posed in Ortiz's motion—whether the questions that Officer Reinmiller asked after he looked in the car but before Ortiz was arrested and administered his *Miranda* rights constitute a *Terry*-type inquiry or a "interrogation" in violation of *Miranda*—is no longer at issue because the Government has chosen not to use Ortiz's pre-*Miranda* statements in its case-in-chief.[134]

Therefore, the only question remaining before the Court is whether the Officers engaged in a deliberate two-step interrogation such that Ortiz's post-*Miranda* statements should be excluded.  *See Missouri v. Seibert*, 542 U.S. 600 (2004).  Here, the Court assumes, for the purpose of this analysis, that Officer Reinmiller's pre-*Miranda* questions were improper.  But the Officers do not appear to have engaged in a ***deliberate*** two-step interrogation; the Court credits the Officers' testimony with respect to their lack of malintent.[135]  And furthermore, Officer Wardle's *Miranda* warning was effective.  As discussed in the facts section above, *see supra* Part II.A., Officer Wardle affirmatively interrupted Ortiz, stating that he needed to administer Ortiz's *Miranda* rights because Ortiz was talking—a statement with a clear implication that Ortiz had a right to ***stop*** talking.  And, as discussed in the facts section, *see supra* Part II.A., Officer Wardle recited the *Miranda* rights to Ortiz in a clear and deliberate manner and obtained verbal acknowledgement from Ortiz after reciting each right and again in summary at the end.  The test for whether a *Miranda* infringement has been cured is the reasonable person standard.  *See id.* at 622.  Here, the Court concludes that, if there was an infringement of Ortiz's Fifth Amendment rights, Officer Wardle's crystal-clear *Miranda* warning effectively cured it.

---

[132]   *See generally* Fifth Amendment Motion.

[133]   Again, this section is written in the hypothetical:  because Ortiz's Fourth Amendment rights were violated, the Officers did not have probable cause to arrest him.

[134]   Fifth Amendment Opposition 7 n.1.

[135]   *See* Hearing Transcript 13:6-23 (Officer Wardle) & 69:10-71:11 (Officer Reinmiller).

C.       **Alleged Sixth Amendment Violations**[136]

Finally, Ortiz argues that the delay between his December 2019 arrest and May 2023 indictment violates his Sixth Amendment guarantee of a speedy trial.[137]  But the Sixth Amendment simply does not apply pre-indictment.  *See, e.g.*, *United States v. Marion*, 404 U.S. 307, 320-21 (1971).  Ortiz's argument thus fails.

Although Ortiz did not assert a Fifth Amendment Due Process violation with respect to that delay, the Court will nonetheless address it because it is closely related to the Sixth Amendment argument that Ortiz does raise.  The Government did not analyze Ortiz's cellphone data until after the May 2023 warrant was issued, creating the safe assumption that the delay was an "investigative delay."

> [I]nvestigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," . . . precisely because investigative delay is not so one-sided.  Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt.  Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed[.]"  . . .  We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

*United States v. Lovasco*, 431 U.S. 783, 795–96 (1977) (quoting *Marion*, 404 U.S. at 324; *Smith v. United States*, 360 U.S. 1, 10 (1959)) (internal citations omitted).

Thus, Ortiz's challenge to the period between his arrest and indictment fails under both the Fifth and Sixth Amendments.

## V.  DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.       Ortiz's Fourth Amendment Motion is **GRANTED**.

---

[136]    Ortiz's Sixth Amendment Motion is not subject to the same hypothetical analysis as the Cellphone Suppression and Fifth Amendment Motions.

[137]    *See generally* Sixth Amendment Motion.

2.      Ortiz's Cellphone Suppression Motion is **GRANTED**.

3.      Ortiz's Fifth Amendment Motion is **GRANTED**.

4.      All evidence that the Government gathered as a result of its unconstitutional search and seizure, including Ortiz's oral statements to the Officers, the physical evidence recovered from the Toyota, and the digital evidence pulled from Ortiz's cellphone, is **SUPPRESSED**.

5.      Ortiz's Sixth Amendment Motion is **DENIED**.

**IT IS SO ORDERED.**

Dated:___February 5, 2024___                    _____
                                                John W. Holcomb
                                                UNITED STATES DISTRICT JUDGE